# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In re the Personal Restraint of | No. 45348-7-II |
| DERON ANTHONY PARKS, | UNPUBLISHED OPINION |
| Petitioner. | |

LEE, J. — In 2010, Deron Anthony Parks was convicted of second degree rape and furnishing liquor to minors. We affirmed his convictions on direct appeal[1] and subsequently dismissed his personal restraint petition (PRP).[2] The Washington Supreme Court granted Parks's motion for discretionary review and ordered this court to consider his PRP claim of ineffective assistance of counsel for failing to interview exculpatory witnesses after remanding to the trial court for a reference hearing.[3]

In his PRP, Parks argues that his trial counsel provided ineffective assistance because she failed to interview exculpatory witnesses: James Hettrick, Kristofer Bay, and Richard Rolph. We hold that defense counsel provided ineffective assistance because but for counsel's failure to

---

[1] *State v. Parks*, noted at 169 Wn. App. 1041, 2012 WL 3202110, at *1.

[2] Order Dismissing Pet. & Denying Pet'r's Mot. for Default J., *In re Pers. Restraint of Parks*, No. 45348-7-II (Wash. Ct. App. July 15, 2014).

[3] *In re Pers. Restraint of Parks*, 349 P.3d 819 (Wash. 2015) (Order).

interview Hettrick, Bay, and Rolph, the result of the trial likely would have been different. Accordingly, we grant the PRP and remand for a new trial.

FACTS

A.    THE CHARGES

On July 29, 2010, the State charged Parks with second degree rape and furnishing liquor to minors for crimes committed against CAT,[4] and indecent liberties and delivery of a narcotic to a minor for crimes committed against TMD.  The second degree rape and furnishing liquor to minors charges stemmed from a party in December 2008 at the house of Parks's friend, Tyler.

B.    TRIAL PROCEEDINGS

After a jury was empaneled and sworn, defense counsel requested that the State present an offer of proof of TMD's trial testimony.  Defense counsel had not yet interviewed TMD about the charges against Parks involving TMD.  The trial court granted defense counsel's request.

During the State's offer of proof, TMD testified that he did not recall making any kind of report that Parks had sexually assaulted him or touched him in a sexual manner.  TMD also testified that he did not remember ever telling the police that Parks provided him drugs.

Based on TMD's testimony in the State's offer of proof, defense counsel moved to dismiss the charges involving TMD against Parks.  Because the State had no other evidence to support or corroborate the charges involving TMD against Parks, the trial court dismissed those charges.  The trial proceeded on the charges against Parks involving CAT.

---

[4] Pursuant to General Order 2011-1, we use initials for minor witnesses in sex crime cases.  Gen. Order 2011-1 of Division II, *In Re The Use Of Initials Or Pseudonyms For Child Witnesses In Sex Crime Cases* (Wash. Ct. App.), http://ww.courts.wa.gov/appellate_trial_courts/.

At trial, CAT testified that he was at a party at Tyler's house in December 2008. He arrived at the party sometime after 10 PM. CAT also testified that he was not on any drugs that night. But Parks provided him with alcohol at the party, and he passed out. It was dark outside when CAT awoke to Parks anally raping him, and he ran home afterwards.

Mariah Flennory, CAT's friend, also testified at trial. She stated that CAT spoke to her about the incident and that he was reluctant to tell her about it.

Officer Sandra Aldridge testified that CAT's mother made the report of sexual assault on CAT. This report was made on October 1, 2009.

Parks testified that he was at the party with CAT at Tyler's house in December 2008, but he did not provide CAT with any alcohol nor did he have any sexual contact with him. Parks left the party around 10:30 PM to go to a bar and then went home afterwards. Parks did not return to Tyler's house until around 10:30 AM the next morning. Parks also testified that he believed CAT, CAT's brother, and TMD had burglarized his home in February 2009 and that CAT fabricated the rape allegation in retaliation for Parks's report to the police that CAT was involved in the burglary.

Defense counsel did not call any witnesses to corroborate Parks's testimony. The defense's theory at trial focused on CAT fabricating the rape and alcohol allegations in retaliation for Parks reporting to the police that CAT was involved in the burglary of Parks's home. The jury convicted Parks of second degree rape and furnishing liquor to minors.

C.    POST-TRIAL PROCEDURE

Parks appealed his convictions, and we affirmed on direct appeal.[5]  Parks subsequently filed a PRP in this court that was dismissed.[6]  He then filed a motion for discretionary review based on ineffective assistance of counsel with the Washington Supreme Court.[7]

Our Supreme Court granted review and remanded the matter to this court "for the purpose of directing the trial court to hold a reference hearing and then further considering the merits of [Parks's] claim that his counsel was ineffective by failing to interview exculpatory witnesses."[8]  Pursuant to our Supreme Court's remand order, we transferred the case to the trial court to address

> (1) what testimony James Lee Hettrick, Kristofer James Bay, and Richard Rolph would have provided if they had testified, (2) whether Petitioner asked his counsel to contact these individuals, (3) whether these individuals attempted to contact counsel, (4) whether counsel had any legitimate tactical reasons for not presenting these individuals as witnesses, and (5) any other factual issue bearing on counsel's alleged failure to interview these witnesses.

Clerk's Papers (CP) at 61.

D.    REFERENCE HEARING

At the reference hearing, the following witnesses testified: Parks; Suzan Clark, who was Parks's trial counsel; Hettrick; Bay; Rolph; and Gary Rice, who was a defense investigator hired to work on Parks's case.  After receiving all the evidence, the trial court made findings of fact that recited the testimony of the witnesses.  In relevant part, the trial court's findings of fact included:

---

[5] *Parks*, noted at 169 Wn. App. 1041, 2012 WL 3202110, at *1.

[6] Order, *In re Parks*, No. 45348-7-II.

[7] *In re Parks*, 349 P.3d 819.

[8] *In re Parks*, 349 P.3d at 820.

TESTIMONY OF JAMES HETTRICK

. . . .

H-4.    In December, 2008, Hettrick attended a party at Tyler's house, in the Rose Village area of Vancouver, Washington.  He arrived around 8 PM.  At the party, Parks cooked teriyaki chicken.  Hettrick is not exactly sure of the date in December, 2008, that this particular party occurred.

H-5.    In his declaration of January 22, 2013, Hettrick wrote that the victim [CAT] (whom he had never met before), arrived at Tyler's house around 9:30 p.m. [C.T] was quiet, sat by himself, and commented to others that he [CAT] had taken "oxy" and Vicodin before he came to Tyler's.

H-6.    Around 10 pm (possibly as late as 10:30 pm), Parks asked Bay for a ride to Mojo's, a bar in downtown Vancouver.

H-7.    [CAT] indicated that he would be staying at Tyler's house that night.

H-8.    Hettrick left Tyler's residence with Bays and Parks.  Bays dropped off Parks at Mojo's, and then took Hettrick to his (Hettrick's) home.  In Exhibit #3, Hettrick states that Parks did not return to Tyler's house that night.

H-9.    Hettrick did not return to Tyler's home that evening.

. . . .

H-11.   Hettrick's statement (Exhibit #3), which he testified was truthful, indicates that he heard [CAT] say that he ([CAT]) would claim that Parks raped him if Parks reported [CAT's] involvement in the burglary of Parks['s] home to the police.

H-12.   Hettrick was never contacted by Police or Park's lawyer or an investigator prior to the trial.  He does not recall when he was first contacted to make a statement.

. . . .

H-14.   Hettrick would have been available to testify and would have testified had he been contacted or asked to testify.  He was not in hiding.

. . . .

TESTIMONY OF KRISTOPHER BAY

. . . .

B-4.    Bay recalls a party at Tyler's house in 2008, which was attended by Parks, Hettrick and others.  He recalls Parks cooking at the party.  He recalls that he left around 10 or 10:30 that evening with Hettrick and Parks.  He dropped off Parks at Mojo's (a Main Street bar) and then went to his grandmother's for the night.  He did not see Parks again that evening after 10:30 pm.  He does not know where Parks went after he dropped him off.

. . . .

B-6.    Bay was not contacted by Parks, an attorney, law enforcement, or an investigator.  Bay was never contacted to provide a statement for trial or to testify at trial.

B-7.    Bay would have testified at trial if contacted.  He was living in Vancouver, WA, and available to testify.  He was not avoiding contact with anyone.

. . . .

TESTIMONY OF RICHARD ROLPH

. . . .

Rolph-2.    He recalls being with Parks at a skate park in Vancouver, WA, and seeing [CAT] and the group of kids.  Parks confronted the group, accusing them of burglarizing Parks' house.  [CAT] and the group responded that they would make Parks "pay" if he "went to the cops."

. . . .

Rolph-6.    After he was convicted, Parks phoned Rolph and asked him to provide a statement about the incident when [CAT] and the other kids threatened Parks at the skate park.

Rolph-7.    Rolph, who has bad hand-writing, dictated a statement to his girlfriend Jennifer Frye.  Frye wrote down Rolph's statement verbatim.  No one told Rolph what to include in his statement.

Rolph-8.    Rolph's statement was notarized on July 6, 2012 (Exhibit #5).

Rolph-9.    Rolph indicates that his statement "reflects what actually happened."

Rolph-10.    Rolph's statement does not include any threats made by [CAT], [TMD], or the group of young men, either at the skate park or anywhere else.  Rolph testified that he didn't remember to "write it into the statement" because there was "too much stuff going on."  He felt "overwhelmed" by the "stuff going on."

Rolph-11.    He testified that he "wrote what he could" and didn't think that the threats "would help Parks."

Rolph-12.    No one (other than Parks, after he had been convicted) contacted Rolph in regards to the case. Rolph was available and would have testified at trial if called.

. . . .

TESTIMONY OF GARY RICE

Rice-1. Gary Rice has been a private investigator in Vancouver, WA, since 1990. Prior to 1990, he worked for various law enforcement agencies (local, state, and federal) for over 10 years. He has worked on thousands of cases in Clark County since 1990.

Rice-2. Rice was appointed by the Court and "employed by Clark" in 2010 to work as an investigator on the Parks rape case. He was to be paid by Clark County for his services. Rice has no recollection of the case or what specific work he did on the case.

Rice-3. Rice has reviewed his billing information (Exhibit #2) but cannot remember any details about any of the entries (e.g. he has no recollection of what discovery he reviewed or who he called or sent emails to on September 20, 2010). Rice is a "stickler for accuracy" and always records his time and what work he has done on a case.

Rice-4. Rice's practice is to document meetings with attorneys, make notes of people to be contacted along with pertinent information, and then make note of the actual contact.

Rice-5. Rice stated that "if it's not in the billing statement, it never happened."

Rice-6. Exhibit #2 accurately reflects the work that Rice performed on the Parks case.

Rice-7. Had Rice been asked to locate a specific witness, it would be reflected in his billing statement. He stated that ["]there should be a note sheet in the file, with an entry, and it would be attached to the final . . ."

Rice-8. There are no entries in Exhibit #2 indicating that Rice was asked to find any witnesses.

Rice-9. His review of Exhibit #2 tells him that he "was never instructed to find anyone."

. . . .

Rice-11.    Rice obtained his case notes during a recess in the hearing. He stated that it was his practice to always write the names of witnesses that he had been given by an attorney in his case notes.

Rice-12.    His case notes (Exhibit #7) do not include the names of Bay, Hettrick, or Rolph.

Rice-13.    Rice testified that it was "safe to conclude that Judge Clark did not give me the names of witnesses" and that Rice "did not find" any witnesses.

TESTIMONY OF DERON PARKS

. . . .

P-2.    Clark met with Parks in the Clark County jail.  Clark asked for the names and contact information for any witnesses that Parks had regarding the allegations.  Parks told Clark that he did not commit the offense.

P-3.    Parks provided Clark with the names of witnesses, including Bay, Hettrick, and Rolph (among others).  He also provided the substance of testimony of each witness.

P-4.    In essence, Parks told Clark that he had left the party with Hettrick and Bays, had gone to Mojo's, and was not physically present when the allegation occurred.

P-5.    Parks also told Clark that he provided the contact information as well as the substance of the testimony of Richard Rolph.

P-6.    In essence, Rolph was with Parks at the skate park when Parks confronted [CAT] and his group about the burglary of [Parks's] residence.  Rolph was present when [CAT] and his group threatened to "mess ([Parks's]) life up."

. . . .

P-8.    Parks was unable to personally contact any witnesses prior to the trial.

P-9.    To Parks'[s] knowledge, Clark never contacted any witnesses. When Parks asked about witnesses, Clark replied that she was "working on it."

P-10.   Parks never met investigator Gary Rice.

P-11.   Parks complained to Clark about the failure to interview witnesses.

P-12.   Parks was present in court at the Readiness Hearing when witnesses were discussed in court.

P-13.   Parks was present at the trial.

P-14.   Parks indicates that he had no idea that Clark was going forward "without calling witnesses."

P-15.   Clark never requested Parks to "approve" of a continuance.

P-16.   After his appeal was over, Parks contacted Bay, Hettrick, and Rolph, asking them for statements.  Parks did not tell them what to "say" in their statements.  He used the statements in his Personal Restraint Petition.  Parks was unrepresented at this time, and had no funds.

TESTIMONY OF SUZAN CLARK
. . . .

C-8.   She was appointed to represent 8 to 10 defendants charged with felony sex offenses per year, and, throughout her career as a defense attorney, was retained to represent 15 to 20 defendants charged with Rape.
. . . .

C-10.   Clark recalls representing the Defendant, [Deron] Parks, in 2010, on a charge of Rape in the Second Degree.  Clark felt comfortable handling sex offenses due to the number of cases, and acquittals, that she had experienced.

C-11.   She had a contract to represent 96 Felony equivalents that year, which was fairly typical for her.

C-12.   Clark represented approximately 300 defendants in the three years following her representation o[f] Parks.

C-13.   Having been made aware of the Reference Hearing for this matter, . . . Clark was able to review her work on the Defendant's case by reviewing her case files.  Said file are electronically stored and easily accessible.  Her files consist of all the notes, letters, and almost everything else that was generated for the case.  She was also interviewed by Mr. [McCarty] (State) and Mr. Hays (Defense).

C-14.  Clark has a "pretty strong memory" of the case, partly because she described it as "unusual" and a ["]little different" in that the Defendant was not only adamant that he was not guilty, but that he was particularly offended at the nature of the allegations (same sex rape).  Clark also beli[e]ved in Parks' innocence and felt that she would "win" at trial.

C-15.  Clark met with the Defendant in jail.  Clark asked for the names of witnesses, and the Defendant replied that he had "several potential witnesses." Clark asked for the names and telephone numbers of said witnesses.  The Defendant provided the names and phone numbers to Clark.  She had asked for the names of the people in the house on the night in question.

C-16.  Exhibit #1 is Clark's "felony intake sheet."  The sheet contains all of the important information about the case: contact names, witnesses, dates, etc. Clark also notes from interviews of the defendant, as well as the substance of any potential witnesses' testimony.

C-17.  Bay and "JH" names appear in the body of Exhibit #1, but there are no notes relating to the substance of their anticipated testimony.

C-18.  The first page Exhibit #1, lower right corner, lists the name "Bryce Chipman" with an accompanying phone number.  The information is on a "sticky tab" that covers the names and telephone numbers of James Hettrick and Chris Bay. Clark is "99%" certain that Bay and Hettrick's names and contact information are located below the 'sticky tab.'

C-19.  Clark does not recall Parks providing her with the name of Richard Rolph. Clark stated in an interview that "three names" were under the sticky tab in Exhibit #1, but in the hearing she testified that she had no recollection of Rolph's name being under the tab.  Rolph's name is also not included in her notes in Exhibit #1.

C-20.  Clark provided the witness names and phone numbers to Gary Rice, her investigator.

C-21.  Clark indicates that she may have provided the Parks'[s] witness names and numbers as she was discussing another case with Rice.

C-22.  Rice later told Clark that he was having "difficulties getting a hold of the witnesses."  Clark, as was her practice if the investigator was unable to contact witnesses, attempted to contact the witnesses herself, with little success.
 . . . .

C-24. Clark was unable to contact Bay or Hettrick. She asked Parks for additional contact information (e.g. landline, job, residence, etc.)

C-25. Clark testified that . . . she is "100% sure" that [Parks] never told her that, on the day of the rape, he had left Tyler's house at 10:30 pm., and that Bay and Hettrick were witnesses to his departure. She was also adamant that, had Parks mentioned an "alibi" and had she found Bay and Hettrick to be credible, she would have called them to testify on Parks'[s] behalf.

C-26. The nature of the defense as related by Parks to Clark was that the Parks was never alone with [CAT] at Tyler's house and that the rape accusation was a retaliatory measure that [CAT] took against Parks for pursuing a Burglary charge against [CAT]. Witnesses at the party would have been called to testify about the interactions between Parks and [CAT] that they observed. Clark was under the impression that Parks had remained at Tyler's house the entire evening and night.

C-27. Clark was frustrated that she was unable to locate witnesses. Her office's practice was to clip any phone messages received to a separate sheet of paper, and include it in the file. There are no phone messages from Hettrick, Bay, or Rolph clipped to the file.

C-28. Parks was adamant that his case go to trial as originally set at Arraignment (and well within speedy trial requirements). Clark was aware of State v. Campbell regarding requesting continuances over the objection of the defendant.

C-29. Parks was aware of who was being called as witnesses. He was aware of who was listed on both the State's and the Defense's witness lists. Clark also advised him of whom she would be calling as witnesses. Parks felt that the State would be unable to locate [CAT] for trial.

C-30. Parks was present in court when the case was called ready for trial. He was aware that Hettrick, Bay, and Rolph were not on the Defense's witness list. Clark discussed the witnesses that would be called with Parks. Parks never expressed any concern about Bay, Hettrick, and Rolph's exclusion from the witness list.

C-31. Clark testified that if she had she felt she had needed more time to locate witnesses she would have asked for a continuance and had "no doubt" that it would have been granted.

11

C-32. Clark indicated that Parks was not upset about going to trial with the witnesses that had been disclosed to the Court. She felt that Parks wanted to go to trial on the date set for "tactical" reasons.

C-33. Parks never did specifically instruct Clark to "go to trial without Bay, Hettrick, or Rolph."

C-34. One count against Parks was dismissed the morning of trial when "victim [TMD]" recanted. Clark was not able to interview [TMD] until the morning of trial.

C-35. Parks never complained about Clark's representation, the lack of Bay, Hettrick, or Rolph, until after the guilty verdict.

CP at 80-84, 88-94.

ANALYSIS

A.   PERSONAL RESTRAINT PETITION

We may grant relief on a personal restraint petition only if the petitioner is under unlawful restraint, as defined by RAP 16.4(c). *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 16, 296 P.3d 872 (2013). The collateral relief afforded under such a petition is limited and requires the petitioner to show that he was prejudiced by the error in the trial court. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 819, 650 P.2d 1103 (1982). There is no presumption of prejudice on collateral review. *Id.* at 823. The petition does not serve as a substitute for an appeal, and the petition cannot renew an issue that was raised and rejected on direct appeal, unless the interest of justice so requires. *Id.; In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004).

A personal restraint petitioner must show either a constitutional error that caused actual prejudice or a nonconstitutional error that resulted in a complete miscarriage of justice. *In re Pers. Restraint of Stockwell*, 161 Wn. App. 329, 334, 254 P.3d 899 (2011), *aff'd*, 179 Wn.2d 588 (2014); *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-11, 792 P.2d 506 (1990). Without either

showing, we must dismiss the petition. *Id.* at 810, 812. With claims of ineffective assistance of counsel, the prejudice prong is established by showing "a reasonable probability that the outcome of the proceedings would have been different" absent the ineffective assistance. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 845, 280 P.3d 1102 (2012).

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

Parks argues that he received ineffective assistance of counsel at trial because defense counsel failed to interview his witnesses that would have given exculpatory testimony. We hold that defense counsel provided ineffective assistance.

The right to effective assistance of counsel is afforded criminal defendants by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). A personal restraint petitioner alleging a violation of his constitutional right to effective representation meets his burden to show actual and substantial prejudice when he makes a successful ineffective assistance of counsel showing under *Strickland*. *Crace*, 174 Wn.2d at 845.

To establish ineffective assistance of counsel, Parks must show both deficient performance and resulting prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If Parks fails to establish either prong of the test, we need not inquire further. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726, *review denied*, 162 Wn.2d 1007 (2007).

Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). There is a strong presumption of effective assistance, and Parks

bears the burden of rebutting that presumption by showing the lack of a legitimate strategic or tactical reason for the challenged conduct. *McFarland*, 127 Wn.2d at 336; *State v. McLean*, 178 Wn. App. 236, 247, 313 P.3d 1181 (2013), *review denied*, 179 Wn.2d 1026 (2014). Resulting prejudice must also occur and the appellant must demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335.

To provide effective assistance, defense counsel must investigate the case, which includes investigation of witnesses. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). The duty to investigate does not necessarily require that every witness be interviewed, but defense counsel has an obligation to provide factual support for the defense where it is available. *Davis*, 152 Wn.2d at 739. "Failure to investigate or interview witnesses, or to properly inform the court of the substance of their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest." *State v. Ray*, 116 Wn.2d 531, 548, 806 P.2d 1220 (1991). Therefore, failure to interview a particular witness may constitute deficient performance. *Jones*, 183 Wn.2d at 340. But deficient performance may hinge on the reason for such failure to interview. *Id*. And "[i]n evaluating prejudice, ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Davis*, 152 Wn.2d at 739 (internal quotation marks omitted).

1. Deficient Performance

Parks argues that defense counsel's failure to interview his alibi witnesses constituted deficient performance. We agree.

a.    Failure to interview witnesses

Here, while defense counsel testified that she has a "pretty strong memory" of Parks's case and that she attempted to contact and interview the witnesses provided by Parks, the remaining evidence shows otherwise. CP at 84. Based on the trial court's findings of fact, Parks provided defense counsel with the names of three witnesses before trial—Hettrick, Bay, and Rolph. He also provided defense counsel with the witnesses' contact information and what the substance of their testimony would be. Although there is a dispute as to whether Parks informed defense counsel about the substance of the information each witness had, defense counsel does not dispute that Parks gave her Hettrick's and Bay's names. And there is confusion as to defense counsel's recollection of whether Parks gave her Rolph's name because defense counsel did state in an interview with appellate counsel that there were "three names" under the sticky tab on her felony intake sheet. CP at 85.

Defense counsel testified that she provided the names and phone numbers of the witnesses to her investigator, Rice, but Rice later told her he was having difficulty contacting the witnesses. However, Rice's testimony and records are contrary. Rice is a "stickler for accuracy" and "always records his time and work done on a case." CP at 88. Rice's records reflect the work he did on Parks's case, and "if it's not in the billing statement, it never happened." CP at 89. Rice's records do not show that defense counsel asked him to find any witnesses.

Furthermore, despite defense counsel's contention that she has a pretty strong memory of Parks's case, her own testimony at the reference hearing and the record cast a shadow upon that claim. Defense counsel testified at the reference hearing that she was "'100% sure' that [Parks] never told her that, on the day of the rape, he had left Tyler's house at 10:30 pm." CP at 87. In

15

fact, she was "under the impression that Parks had remained at Tyler's house the entire evening and night." CP at 87. But the trial record shows the contrary. On direct examination of Parks at trial, defense counsel asked Parks what time he left the party that evening and what he did afterwards. Parks testified that he left the party around 10:30 PM to go to a bar and went home afterwards.[9] Parks testified at trial that he did not return to Tyler's house until around 10:30 AM the next morning.

Here, had the witnesses been interviewed, they would have provided the following testimony regarding the charges. CAT arrived at the party around 9:30 PM. When CAT arrived, he commented that he had "taken 'oxy' and Vicodin before" arriving at the party. CP at 81. Hettrick and Bay would have testified that Parks left with them from the party around 10:30 PM, and that they dropped him off at a bar called Mojo's. Hettrick would have also testified that Parks did not go back to the party that night.

This testimony would have refuted the only testimony, CAT's, placing Parks at the party when the alleged rape occurred. It also would have corroborated Parks's version of events on the night of the party: that he did not furnish any alcohol to CAT, that he left the party around 10:30 PM, and that he did not commit the alleged rape. And while Hettrick would have also testified that he did not return to the party either that night, such testimony would not necessarily have undermined his testimony about Parks not returning to the party. Nor does it appear that any adverse consequences would have resulted from Hettrick's and Bay's testimony.

---

[9] Defense counsel's notes are unclear as to whether Parks spent the night at the party because the notes state both that he "stayed" and "D/N Stay." Ex. 1.

Further, had the witnesses been interviewed, they would have provided the following testimony to corroborate the defense's theory that CAT fabricated the allegations against Parks in retaliation for Parks reporting to the police that CAT was involved in the burglary of Parks's home. Hettrick would have testified that he heard CAT threaten to claim that Parks raped him if Parks reported to the police that CAT was involved in the burglary of Parks's home. And Rolph would have testified that he was with Parks when CAT, CAT's brother, and TMD threatened to mess up Parks's life if Parks reported to the police that they were involved in the burglary at Parks's home.

Because Parks and CAT were the only witnesses who testified at trial to this confrontation regarding the threats that were made against Parks, Hettrick's and Rolph's testimony would only have helped Parks's case. Their testimony would not only have supported the defense's argument that CAT's rape allegations were fabricated and retaliatory, but also would have bolstered Parks's credibility while calling CAT's into question.

Defense counsel has an obligation to investigate and provide factual support for a defense when corroboration is available. *Davis*, 152 Wn.2d at 739. Here, defense counsel was provided with information that pointed to a possible alibi defense. Thus, defense counsel's failure to contact and interview these alibi witnesses, absent an appropriate reason or legitimate trial tactic, constitutes deficient performance. *See Jones*, 183 Wn.2d at 339-41.

> b.  Legitimate trial tactic

The State argues that there was a legitimate trial tactic for defense counsel's failure to contact these witnesses before proceeding to trial. The State supports its argument with the trial court's findings relating to defense counsel's testimony at the reference hearing.

Defense counsel testified that she was having difficulty locating the witnesses Parks told her about, but Parks was adamant he wanted to proceed to trial in hopes that the State could not locate CAT for trial. She felt that Parks wanted to go to trial on the initial date set for "tactical" reasons. CP at 88. Defense counsel also testified that Parks was aware of who was going to be called as witnesses and did not express any concerns about the absence of Hettrick, Bay, and Rolph on the defense witness list.

But the record shows that CAT was in custody at a treatment facility. And Parks testified that he was unaware that defense counsel was going forward without calling alibi witnesses; in fact, Parks filed a complaint about such inaction after trial.

Defense counsel was also aware of *State v. Campbell*, 103 Wn.2d 1, 15, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985), which allows counsel to request a continuance over the objection of the defendant. And defense counsel admitted that had she requested such a continuance, she had no doubt that it would have been granted. Trial strategy and tactical decisions are generally for counsel to make, not the client. *State v. Cross*, 156 Wn.2d 580, 606, 132 P.3d 80, *cert. denied*, 549 U.S. 1022 (2006). Therefore, even if Parks wanted to proceed to trial and not seek a continuance, defense counsel had the ability to seek a continuance in order to locate exculpatory witnesses and ensure effective representation.

When an attorney makes an uninformed decision, it cannot be characterized as a strategic one. *See Jones*, 183 Wn.2d at 341. Defense counsel knew that Parks left the party around 10:30 PM. Attempting to locate others that were at the party may have provided corroborating evidence. But defense counsel claimed that she did not know of the substance of Hettrick's and Bay's

testimony, even though Parks provided their names to her in response to her request for the names of people in the house on the night in question. Also, the defense's theory that CAT was fabricating the allegations against Parks in retaliation was lent some credence after TMD's testimony in the State's offer of proof. Thus, the decision to forego a request for a continuance, without knowledge of the witnesses' potential testimony, was uninformed and could not be the basis of a strategic decision. Therefore, defense counsel's decision to proceed to trial without interviewing Hettrick, Bay, and Rolph, constituted deficient performance.

However, even if defense counsel was deficient for failing to further investigate or interview the exculpatory witnesses, our inquiry does not end. We must still consider whether defense counsel's deficient performance prejudiced the defendant.

2.      Prejudice

Here, there is a reasonable probability that but for defense counsel's failure to interview Hettrick, Bay, and Rolph, the result of the trial would have been different. At trial, Parks testified that he left the party around 10:30 PM to go to a bar and then went home afterwards. This was an alibi, which was known to defense counsel, as evidenced by her questioning on direct examination. Parks also testified that he did not give any alcohol to CAT.

If contacted, Hettrick and Bay would have testified and would have corroborated Parks's version of events. They would have testified that Parks left the party around 10:30 PM and did not return. Hettrick also would have testified that CAT admitted that he had taken "oxy" and Vicodin before coming to the party. CP at 81. Rolph was also available to testify and would have testified that CAT threatened Parks that if Parks reported him to the police for the burglary of Parks's home, CAT would make him "pay." CP at 83. Hettrick would have similarly testified that

19

he heard CAT say that he would claim Parks raped him if Parks reported CAT's involvement in the burglary of Parks's home to the police.

But Hettrick, Bay, and Rolph were never contacted by an attorney or investigator. No witnesses were presented to corroborate Parks's alibi. As a result, the jury had to weigh CAT's testimony of the allegations and the testimony of the State's other witnesses with whom CAT spoke against Parks's singular testimony.

Considering the fact that there was no physical evidence in this case and that the outcome of the trial was based solely on the credibility of the witnesses—especially CAT as he provided the only direct evidence of the rape—there is reasonable probability that the jury's inability to consider such exculpatory testimony from the defense affected the outcome of the trial. *See Jones*, 183 Wn.2d at 344 (stating that the lack of additional defense witnesses likely affected the outcome of the trial, where the State presented five witnesses and the defense presented only one). The testimony of Hettrick, Bay, and Rolph would have considerably strengthened the defense's case, as Parks was the only witness who testified to his version of events and the theory that CAT's rape allegations were fabricated in retaliation for Parks informing the police of CAT's involvement in the burglary of his home.

The State argues that the witnesses' testimony cannot be reconciled with the testimony that Parks provided at trial. But the witnesses' testimony do not contradict Parks's testimony; the testimony supplements Parks's testimony. Although Parks did not mention leaving the party with anyone or confronting CAT with anyone, Hettrick's, Bay's, and Rolph's testimony of their

presence during these events do not refute or conflict with any of Parks's testimony. In fact, defense counsel testified at the reference hearing that she asked Parks for the names of the people at the party on the night of the alleged incident and even testified that if she was aware of the alibi testimony of Hettrick and Bay, she would have wanted to present that at trial.

In light of the testimony presented at trial and the testimony the exculpatory witnesses could have provided, we hold that had that testimony been presented to the jury, there is a reasonable likelihood the result of the trial would have been different. Therefore, defense counsel's failure to interview Hettrick, Bay, and Rolph constituted ineffective assistance.

3. Appropriate Remedy

For claims of ineffective assistance of counsel, the appropriate remedy on appeal is to remand to the trial court for a new trial, which places the "defendant back in the position he would have been in if the Sixth Amendment violation had not occurred." *State v. Crawford*, 159 Wn.2d 86, 107–08, 147 P.3d 1288 (2006); *see In re Pers. Restraint of Orange*, 152 Wn.2d 795, 814, 100 P.3d 291 (2004) (holding that the proper remedy for counsel's failure to raise on appeal the violation of appellant's public trial right was remand for a new trial). Because Parks received ineffective assistance of counsel, we grant the PRP and remand to the trial court for a new trial.

## APPELLATE COSTS

Parks requests that we decline to impose appellate costs against him if the State substantially prevails on this appeal. We do not consider an award of appellate costs because Parks is the prevailing party in this PRP.

No. 45348-7-II

We grant the PRP and remand to the trial court for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Bjorgen, C.J.

_____
Melnick, J.